IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Joy Ellen Post,                    :

        Plaintiff,                 :

    v.                             :     Case No.  2:15-cv-2110

Commissioner of Social Security,         JUDGE MICHAEL H. WATSON
                                         Magistrate Judge Kemp
        Defendant.                 :

REPORT AND RECOMMENDATION

I.  Introduction

    Plaintiff, Joy Ellen Post, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on January 21, 2012, and alleged that Plaintiff became disabled on March 6, 2007, which date was later amended to July 23, 2011.

     After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on October 31, 2013.  In a decision dated December 23, 2013, the ALJ issued a decision denying benefits.  That became the Commissioner's final decision on March 17, 2015, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on July 30, 2015. Plaintiff filed a statement of specific errors on September 2, 2015, to which the Commissioner responded on December 3, 2015.  Plaintiff filed a reply brief on January 4, 2016, and the case is now ready to decide.

II.  The Lay Testimony at the Administrative Hearings

    Plaintiff, who was 47 years old as of the date of the hearing and who is a high school graduate with some college work, testified as follows.  Her testimony appears at pages 49-75 and

82-84 of the administrative record.

Plaintiff testified that she lived alone and took care of her dog.  Her neighbor helped by taking the dog out for walks. Plaintiff used a cane when walking to help her balance.  It was prescribed by her pain management doctor.

The last time Plaintiff worked was in 2011.  She was employed as a home health aide doing laundry, cleaning, and cooking.  From January 2010 to January 2011 she worked as a nurse's aide, and she had done a similar job earlier.  Before 2010 she was a stock clerk and cashier at a Speedway gas station and worked at a pizza factory.  She did not think she could work as a nurse's aide due to daily pain and swelling.

Plaintiff's most significant medical problem was fibromyalgia.  She had pain and swelling all over her body, and had more bad days than good ones.  On bad days she occasionally needed help to get out of bed.  Standing or sitting made her problems worse, and sometimes she could not walk even short distances.  Her symptoms were alleviated by lying down with her feet elevated.  She had problems concentrating as well. Additionally, she had low back pain, had no strength in her arms, and suffered from carpal tunnel syndrome.  Plaintiff also reported migraine headaches which could last from four hours to all day, and ADHD, which made it hard for her to multi-task. Lastly, she had bipolar disorder which caused both depression and irritability.

Plaintiff said she could walk as far as from her kitchen to her living room.  She needed to use a cane and stop to rest while walking a block.  She could not stand for more than ten minutes at a time and could sit for 20 minutes.  She could not lift a gallon of milk.  Side effects from her medications included dizziness and sleepiness.  She was able to attend church once or more weekly.  During the day, she read or watched television and

did some dishes, but could not run the vacuum.  Finally, she had recently developed a problem with urinary incontinence, for which she had begun seeing a urologist.

### III.  The Medical Records

The medical records in this case are found beginning on page 331 of the administrative record.  The pertinent records can be summarized as follows.

Plaintiff was treated for joint problems as early as 2007.  During an examination on November 6, 2007, which was for pain in the right hip, she had normal range of motion but tenderness over the greater trochanter.  Before that, she had been treated for chronic pain in her low back, shoulder, hip, leg, neck, arm and feet, and was treated for fibromyalgia as well as, later, for a cervical sprain.  She was also treated for GERD in 2007 and had surgery in 2008 to repair a hiatal hernia.  She received injections and took medication for fibromyalgia and other conditions in 2008 and 2009, including Topamax, Percocet, Ultram, Cymbalta, Wellbutrin, BuSpar, Flexeril, Inderal, Lasix, and Reglan.  Objective medical studies done during that time period and for several years after, such as CT scans, were essentially normal.  Some of her medications were discontinued due to side effects, and when she saw Dr. Ott, a rheumatologist, in 2012, a good exercise routine was recommended, along with treatment for sleep apnea.  (Tr. 574-75).  Plaintiff continued to see Dr. Ott or Dr. Ott's certified nurse practitioner, and she showed improvement on Savella and also participated in physical therapy.

Dr. Swedberg performed a consultative medical examination on June 8, 2012.  Plaintiff's chief complaint was fibromyalgia, which she had suffered from since 2005.  Activity worsened her pain, as did cold damp weather and poor sleep.  She walked with a steady gait and appeared comfortable both sitting and lying down.  She showed a decreased range of motion in her neck, shoulders,

-3-

and back.  She could not squat or walk heel to toe.  Her muscle strength and reflexes were normal.  Dr. Swedberg thought she could do a moderate amount of sitting, standing, walking, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects, but she did have trouble with overhead reaching. (Tr. 567-69).

Following that evaluation, Plaintiff resumed treatment with Dr. Walter, whom she had seen years earlier.  At that time, she reported both pain and numbness which had worsened in the past year.  Any level of activity increased its severity.  She had discomfort with cervical and lumbar range of motion and she had tenderness in a majority of the fibromyalgia points.  (Tr. 594-95).  She also saw him for follow-up appointments, telling him in November, 2012, that her symptoms had gotten worse, particularly in the low back.  It was an effort for her to read or to converse.  In January, 2013, she said that back injections had helped somewhat.  (Tr. 602).  During an examination in April, 2013, done by Dr. Marshall, she was walking with a cane and exhibited numerous pain behaviors.  (Tr. 684).  In June, 2013, she was diagnosed with possible carpal tunnel syndrome, and underwent a right carpal tunnel release in August, 2013.  (Tr. 643, 676).  There are also numerous notes from Dr. Graham, who appeared to be Plaintiff's regular physician, during this time frame, which do not appear to be specific for treatment of fibromyalgia.

On June 4, 2012, Plaintiff underwent a psychological evaluation performed by Dr. Miller, a neuropsychologist.  She reported medical problems and hyperactivity as well as significant anxiety and depression.  She exhibited pain behavior during the clinical interview and was overly talkative.  Her concentration was poor as was her motivation.  Her daily activities were limited and she had no hobbies or community

activities.  Dr. Miller diagnosed severe ADHD and moderate dysthymic disorder, rated Plaintiff's GAF at 55, and thought she would have some difficulty getting along with others and was significantly impaired both in her ability to maintain attention and concentration and to deal with work stress.  (Tr. 550-55).

Plaintiff sought psychiatric treatment from Dr. Thalassinos in May, 2013.  His impressions at that time included bipolar disorder and rule out ADHD.  He noted that she was verbose and circumstantial and presented with a depressed mood.  She reported being more depressed lately as well as more forgetful and unfocused.  He prescribed medication and recommended that she continue her counseling.  (Tr. 620-24).  Plaintiff did continue to see a counselor at Tri-County Mental Health, during which she reported some improvement of her symptoms with Lamictal.

State agency physicians and psychologists also reviewed the records.  In July, 2012, Dr. Perencevich concluded that Plaintiff could do a limited range of light work, had no postural limitations, and was restricted in overhead reaching.  (Tr. 98-99).  Dr. Bolz, a second reviewer, reached the identical conclusions.  (Tr. 130-31).

From a psychological standpoint, Dr. Zwissler said that Plaintiff could do simple and moderately complex tasks in a routine work environment in which changes are expected, explained, and infrequent.  She could also interact superficially with others.  He thought she had a moderate impairment in her ability to maintain concentration and attention and to handle work stress.  (Tr. 99-101).  Dr. Tishler later concurred in this evaluation.  (Tr. 131-33).

### IV.  The Vocational Testimony

Connie O'Brien-Heckler was called to testify as a vocational expert at the administrative hearing.  Her testimony begins at page 77 of the administrative record.

-5-

Ms. O'Brien-Heckler described Plaintiff's past employment as a nurse's aide as a medium strength unskilled job. The factory job was unskilled and light.

Mr. Pruitt was then asked some questions about someone with Plaintiff's background and who could work at the light exertional level. That person could frequently climb stairs and ramps and balance, and could occasionally stoop, kneel, crouch, and crawl. He or she could not climb ladders, ropes, or scaffolds. Also, the person could understand and carry out simple instructions in a workplace where the pace of productivity was not dictated by an external source like a conveyor belt or assembly line. The person could make judgments on simple work and respond appropriately to usual work situations and changes in a routine work setting which was repetitive from day to day with few unexpected changes. The person could also respond appropriately to supervision and could have occasional interaction with co-workers and the public on trivial matters. Finally, the person could frequently handle, finger, and feel with the right upper extremity. Ms. O'Brien-Heckler said that someone with those restrictions could not perform Plaintiff's past relevant work, but could be employed as a garment sorter, marker, or packager. If the person were limited to working at the sedentary exertional level, he or she could be a surveillance system monitor, document preparer, or sorter. Ms. O'Brien-Heckler said that the customary break time for such jobs was two fifteen-minute breaks and a thirty-minute break, and absenteeism was less than one day per month. Also, employees had to be productive for 90% of the day or more.

V.  <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 15-35 of the administrative record. The important findings in that decision are as follows.

-6-

The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since her amended onset date of July 23, 2011. Going to the second step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including degenerative disc disease of the spine, fibromyalgia, obesity, carpal tunnel syndrome, obstructive sleep apnea, and bipolar disorder. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform light work with limitations. They included the ability frequently to use her bilateral upper extremities for fine and gross manipulation, frequently to climb stairs and ramps and balance, and occasionally to stoop, kneel, crouch, crawl, and perform overhead reaching. Further, Plaintiff could never climb ladders, ropes, or scaffolds. She could understand and carry out simple instructions in a workplace where the pace of productivity was not dictated by an external source like a conveyor belt or assembly line and could make judgments on simple work and respond appropriately to usual work situations and changes in a routine work setting which was repetitive from day to day with few unexpected changes. Plaintiff could also respond appropriately to supervision and could have occasional interaction with co-workers and the public on trivial matters, defined as dispensing and sharing factual information not likely to generate an adversarial setting.

With these restrictions, the ALJ concluded that although Plaintiff could not perform her past relevant work, she could perform the light jobs identified by the vocational expert, including garment sorter, marker, and packager. The ALJ further

found that 120 of these jobs existed in the regional economy and 485,000 in the national economy.  Consequently, the ALJ determined that Plaintiff was not entitled to benefits.

VI.  <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ did not properly consider Plaintiff's ADHD; a (2) the ALJ did not properly consider and assess Plaintiff's fibromyalgia; and (3) the ALJ did not properly evaluate Plaintiff's credibility.  These issues are evaluated under the following legal standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439–440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is

supported by substantial evidence.  Kinsella v. Schweiker, 708
F.2d 1058, 1059 (6th Cir. 1983).

A.  ADHD

Plaintiff first asserts that the ALJ did not properly
evaluate her ADHD.  In particular, she argues that all of the
physicians who considered this impairment, including the state
agency reviewers, found it to be a severe impairment, and that
the ALJ erred when he did not reach the same conclusion.  The
Commissioner responds that substantial evidence supported the
ALJ's finding on this issue and that, in any event, he properly
took any limitations arising from Plaintiff's ADHD into account
when determining her residual functional capacity.

The ALJ did include a number of psychological restrictions
when determining Plaintiff's residual functional capacity,
essentially adopting the findings of the two state agency
psychologists on this issue.  They, in turn, noted Plaintiff's
diagnosis of ADHD and considered the findings made by the
consultative examiner, who also diagnosed that condition.
Consequently, the Commissioner is correct that the issue here is
not so much that the ALJ did not list ADHD as a severe
impairment, but whether the ALJ's conclusion as to the
restrictions it caused on Plaintiff's ability to perform work-
related functions is supported by the evidence.  See Maziarz v.
Sec'y of HHS, 837 F.2d 240, 244 (6th Cir. 1987); cf. Simpson v.
Comm'r of Social Security, 344 Fed.Appx. 181, 190-91 (6th Cir.
Aug. 27, 2009)(finding that the ALJ erred by not considering a
non-severe mental impairment when making the residual functional
capacity finding).

Plaintiff's initial argument does not address this issue at
all.  Rather, in her statement of errors, Plaintiff focuses
exclusively on the fact that the ALJ should have treated ADHD as
a severe impairment.  The Court agrees, but cannot find
reversible error in this failure unless it had an impact on the

ALJ's assessment of Plaintiff's residual mental functional capacity.

In her reply, Plaintiff focuses on the areas of attention, concentration, persistence, and pace, arguing that the ALJ did not account for limitations in these areas.  It is not appropriate for a new argument to be raised for the first time in a reply memorandum.  Additionally, however, the state agency reviewers both noted that Plaintiff had moderate impairments in the area of maintaining attention and concentration for extended periods (see, e.g., Tr. 99) but they accommodated those limitations when describing Plaintiff's functional capacity, restricting her not just to simple tasks but also restricting her to a static work environment.  For these reasons, the Court agrees with the Commissioner that the ALJ's treatment of this issue does not provide any basis for a remand.

B.  Fibromyalgia

In her statement of errors, Plaintiff argues that the ALJ did not follow the dictates of SSR 12-2p concerning fibromyalgia. The Commissioner counters that, in terms of a diagnosis, the ALJ never questioned the fact that Plaintiff suffered from fibromyalgia or that it imposed real limitations on her ability to work despite mostly normal objective findings - the issues which SSR 12-2p primarily addresses.  The real question is whether the evidence of record compelled the ALJ to find that Plaintiff's subjective reports of the symptoms caused by her fibromyalgia were entirely credible, because, as the Commissioner notes, none of the treating sources expressed an opinion that Plaintiff was so limited by her fibromyalgia that she could not perform basic work activities.  Plaintiff recognizes the overlap in these issues by combining the discussion of them in her reply, so the Court will turn to the credibility evaluation to determine if that evaluation, which necessarily rejected Plaintiff's report to her doctors of disabling symptoms, is supported by substantial

-10-

evidence.

### C. <u>Credibility</u>

The ALJ, after acknowledging that Plaintiff suffered from medical conditions which could reasonably cause her reported symptoms, found that she was not entirely credible.  He provided several reasons in support of that finding, including: (1) the absence of objective evidence to substantiate her complaints; (2) the fact that she derived benefit from conservative treatment; (3) the absence of signs of disabling pain such as muscle atrophy, persistent muscle spasms, muscle rigidity, or tremors; (4) her noncompliance with various treatment recommendations including physical therapy, a CPAP machine, and to stop smoking; and (5) the absence of any opinion from a treating source that Plaintiff was disabled.  (Tr. 29-30).  Plaintiff, in her statement of errors, does not directly address any of these findings, but simply states that, on this record, "reasonable minds would have come to a different conclusion."  In her reply, she elaborates on this argument slightly, appearing to assert that the ALJ's evaluation of her fibromyalgia was flawed because of his excessive reliance on the lack of objective findings.

Fibromyalgia does present special problems to social security adjudicators precisely because of the lack of objective confirmation of the severity of the symptoms it causes.  Both SSR 12-2p and case law from this Circuit recognize that issue.  Nevertheless, it is the job of an ALJ, even in a fibromyalgia case, to "ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity."  SSR 12-2p.  That Ruling, after discussing in detail how fibromyalgia is diagnosed and when it can be considered a medically determinable impairment - matters not at issue here, since the ALJ found Plaintiff's fibromyalgia to be a severe impairment - then provides some

guidance about how to evaluate the impact of that impairment on a claimant's residual functional capacity.  In the absence of objective medical support, functional capacity is to be determined based on "all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." Id.

As one court has observed, the absence of any objective tests to demonstrate the severity of fibromyalgia "places a premium ... on the assessment of the claimant's credibility" and "[f]or purposes of judicial review, the ALJ's articulation of the reasons supporting his credibility findings becomes very important." Wines v. Comm'r of Social Security, 268 F.Supp.2d 954, 958 (N.D. Ohio 2003).  In that regard, the Court of Appeals has held that "the absence of objective medical evidence to substantiate the diagnosis of fibromyalgia or its severity is basically irrelevant, and more 'aggressive' treatment is not recommended for fibromyalgia patients." Kalmbach v. Comm'r of Social Security, 409 Fed.Appx. 852, 864 (6th Cir. Jan. 7, 2011). In that case, after those bases of the ALJ's credibility finding were eliminated, the Court of Appeals found the analysis wanting because the ALJ mischaracterized the extent of the claimant's daily activities.

Here, the ALJ did consider some of these factors, although he did not discuss in any detail Plaintiff's activities of daily living, which, according to her testimony, were very limited. The record does reflect frequent treatment for symptoms of both fibromyalgia and other conditions such as low back pain and cervical strain.  The ALJ talked about treatment, noting both that it was conservative in nature - which is not unusual in a fibromyalgia case - and that it helped alleviate some of

Plaintiff's symptoms. He also placed significant emphasis on the lack of opinions from treating sources, although, to be fair, evaluating a patient's ability to work is not part of a routine examination, and it does not appear that any of the treating sources were asked to express an opinion on that subject. The one examining source who did so, Dr. Swedberg, concluded that Plaintiff had the physical ability to do most work-related activities, but he, of course, did not have the benefit of a longitudinal treating relationship to see how Plaintiff's fibromyalgia affected her over time. Finally, the ALJ placed reliance on both the fact that Plaintiff, at times, did not follow treatment recommendations, and that the only medical opinions concerning her physical abilities were all consistent with the performance of a limited range of light work.

There is no question that, as to fibromyalgia (although not with respect to Plaintiff's other physical conditions), two of the five reasons given by the ALJ for discounting Plaintiff's credibility - the absence of objective confirmation of her symptoms, and the normal physical findings about muscle strength, atrophy, rigidity, and tremors - are simply irrelevant. The lack of a treating source opinion is a somewhat equivocal factor, although the failure of any treating source even to mention an inability to perform basic work functions may be a factor to be considered. However, the fact that the medical records indicate an improvement in symptoms, including fibromyalgia symptoms, with treatment cuts against the credibility of Plaintiff's testimony about constant debilitating pain and stiffness, and her failure to follow a number of treatment recommendations is a permissible factor to consider as well. See, e.g., Jones v. Colvin, 2016 WL 1162603, *7 (N.D. Ala. March 23, 2016); Wilson v. Colvin, 2016 WL 829087, *5 (N.D. Cal. March 3, 2016).

The Court is troubled by the lack of a more detailed evaluation of Plaintiff's activities of daily living, which is

-13-

especially significant in a fibromyalgia case.  However, it is
the ALJ's province to make a credibility finding, and the Court
owes that finding substantial deference.  Walters v. Commissioner
of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).  Where, as
here, the ALJ cited to legitimate bases for discounting
Plaintiff's testimony which had support in the record, and also
was clearly aware of her testimony as to activities of daily
living, accurately summarizing that testimony in his decision,
the Court cannot say that a reversible error occurred or that a
different result would be reached on remand.  For that reason,
the Court finds no merit in this statement of error, even though
it might be the case, as Plaintiff argues, that a reasonable
person could have come to a different conclusion on this record.
As the Court of Appeals has often noted, "[t]he findings of the
Commissioner are not subject to reversal merely because there
exists in the record substantial evidence to support a different
conclusion." Buxton v. Halter, 246 F.3d 762, 772 (6th Cir.
2001).  Consequently, the Court will recommend that the ALJ's
decision be affirmed.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the
Plaintiff's statement of errors be overruled and that judgment be
entered in favor of the Defendant Commissioner.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation,
that party may, within fourteen (14) days of the date of this
Report, file and serve on all parties written objections to those
specific proposed findings or recommendations to which objection
is made, together with supporting authority for the objection(s).
A judge of this Court shall make a de novo determination of those
portions  of the report or specified proposed findings or
recommendations to which objection is made.  Upon proper
objections, a judge of this Court may accept, reject, or modify,

in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge